OPINION
{¶ 1} Defendant-appellant Jose Luis Balderas appeals from the denial of his motion, made under R.C. 2943.031, to withdraw his guilty pleas to Aggravated Menacing and to Domestic Violence. Balderas contends that the trial court erred by: (1) overruling his motion; and (2) not allowing his wife to testify in support of his motion. Upon the evidence in the record, we cannot say that the trial court erred in finding that *Page 2 
Balderas failed to meet his burden of proof on the issue of whether the convictions resulting from his guilty pleas adversely affected his immigration status. On the evidentiary issue, we conclude that Balderas has failed to preserve this issue for appellate review. One ground for the trial court's decision overruling Balderas's motion was the untimeliness of the motion. Balderas did not proffer what his wife's testimony would have been on that subject, which precludes us from finding that any error in the exclusion of Mrs. Balderas as a witness constituted prejudicial error. Accordingly, the order of the trial court denying Balderas's motion to withdraw his guilty pleas is Affirmed.
 I {¶ 2} In 2000, Balderas pled guilty to one count of Domestic Violence and one count of Aggravated Menacing. A judgment of conviction was entered, and he was sentenced accordingly. Balderas asserts, the State concedes, and the trial court took judicial notice of the fact, that Balderas was not advised of the possible adverse impact of his guilty plea upon his immigration status, as required by R.C. 2943.031.
 {¶ 3} In 2006, Balderas filed a motion to withdraw his guilty pleas, upon the ground that R.C. 2943.031 was not complied with. The trial court heard the motion on December 26, 2006, and on January 23, 2007. Balderas was not present at the hearing, but was represented by counsel. Balderas had evidently been the subject of deportation proceedings in 2003, and had voluntarily left the United States, rather than fight deportation. The trial court noted, with interest, that an affidavit submitted by Balderas in support of his motion was signed in the presence of a notary public on November 1, 2006, and the notary public was an employee in the office of Balderas's *Page 3 
trial counsel. The trial court concluded, reasonably, that Balderas was in the United States, possibly illegally, on that date, at least. The trial court attached great significance to the fact that Balderas was not present at the hearing on his motion.
 {¶ 4} At both the December 26, 2006 and the January 23, 2007 hearing dates, Balderas tendered his wife as a witness who could testify both that Balderas was not a United States citizen at the time of his plea (which borders upon the self-evident, in view of his subsequent deportation), and on the nature of the immigration proceedings, all of which she attended. The trial court did not allow Mrs. Balderas, who was evidently the victim in the underlying criminal case, to testify.
 {¶ 5} In its order overruling Balderas's motion to withdraw his plea, the trial court concluded as follows:
 {¶ 6} "Based upon the length of time (six years) since defendant's conviction in this court, his representation by counsel at his plea, his failure to present himself before this court, his significant criminal history since 2000, and complete lack of evidence that this conviction was the cause of any removal proceedings, the Court finds that the failure to read defendant the Revised Code § 2943.031 warning was harmless error and not fatal to his plea and hereby OVERRULES defendant's November 7, 2006 motion to vacate his plea."
 {¶ 7} From the order overruling his motion, Balderas appeals.
 II {¶ 8} Balderas's First Assignment of Error is as follows:
 {¶ 9} "THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION WHEN IT REFUSED TO GRANT APPELLANT'S MOTION." *Page 4 
 {¶ 10} R.C. 2943.031(A) requires that the trial court, in accepting a plea of guilty or no contest to any criminal charge other than a first-time minor misdemeanor, must give the defendant the following prescribed advisement:
 {¶ 11} "If you are not a citizen of the United States you are hereby advised that conviction of the offense to which you are pleading guilty (or no contest, when applicable) may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."
 {¶ 12} The statute further prescribes the remedy for a defendant who is not given the required advisement:
 {¶ 13} "(D) Upon motion of the defendant, the court shall set aside the judgment and permit the defendant to withdraw a plea of guilty or no contest and enter a plea of not guilty or not guilty by reason of insanity, if, after the effective date of this section, the court fails to provide the defendant the advisement described in division (A) of this section, the advisement is required by that division, and the defendant shows that he is not a citizen of the United States and that the conviction of the offense to which he pleaded guilty or no contestmay result in his being subject to deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (Emphasis added.)
 {¶ 14} The emphasized words indicate that the trial court is without discretion in the matter, and that it is not necessary to show either that the guilty plea has resulted in deportation, exclusion from admission, or denial of naturalization, or that the plea will
necessarily result in one of those consequences, but merely that itmay have one of those results. *Page 5 
 {¶ 15} Despite the fact that the statute imposes no temporal limitation upon the defendant's exercise of the right to withdraw the plea, the Supreme Court of Ohio has added to the matters that a trial court may consider, a defendant's delay in seeking the remedy provided by the statute. State v. Francis, 104 Ohio St.3d 490, 2004-Ohio-6894.
 {¶ 16} The trial court based its denial of the motion upon: (1) the six-year delay in bringing the motion; (2) Balderas's representation by counsel at the time of the plea; (3) Balderas's failure to present himself before the court; (4) Balderas's significant criminal history since 2000; and (5) the "complete" lack of evidence that this conviction was the cause of any removal proceedings. The second and third items stated by the trial court as grounds for its decision find no support in the statute. The statute does not make any exception for taking a plea from a defendant represented by counsel.
 {¶ 17} We understand the trial court's suspicions concerning Balderas's failure to have appeared for the hearing despite having submitted an affidavit apparently executed within this state, but this does not appear to be a proper ground, under the statute, for denying his motion.
 {¶ 18} The fourth item stated by the trial court as grounds for its decision is related to the fifth ground. The statute requires, as a condition for the remedy of vacating the plea, that the plea "may result" in the defendant's being subject to deportation, exclusion from admission to the United States, or denial of naturalization. Presumably, if it were clear that the defendant would not be eligible for admission, or would be subject to deportation, for reasons separate and apart from the conviction or convictions resulting from the guilty plea, then it could not be said that the plea "may result" in the adverse immigration status consequence. *Page 6 
 {¶ 19} No testimony was taken at the hearing on Balderas's motion. There is reference in the record to some documents, but the only documents we have in the record pertain to Balderas's plea of guilty, in 2001, to Misprision of Felony in the United States District Court for the Western District of Washington, reflecting a sentence of 30 months of imprisonment and an "assessment" of $100. Balderas asserted, through his trial counsel, that he was the subject of deportation proceedings, and that he had chosen to leave the country voluntarily, rather than resist his deportation. The State did not dispute this.
 {¶ 20} On the state of this record, we cannot say that the trial court erred in finding a failure of proof on the issue of whether, as a result of Balderas's plea in this case, he may be subject to deportation or the refusal of admission to the United States. It seems plausible that both of these adverse consequences, not to mention disapproval of naturalization, may independently result from Balderas's federal conviction, so that they cannot be said to be the proximate result of his plea in this case. Because Balderas was required to prove that his plea may result in one of the specified adverse consequences to his immigration status, we cannot say that the trial court erred in overruling his motion.
 {¶ 21} Of course, the trial court also predicated its decision upon the delay in the filing of the motion. On this issue, the record is sparse. The motion was filed six years after the plea was accepted. One letter that the trial court considered indicates that the motion was filed three years after Balderas was deported. Either delay is substantial. In the absence of any record addressing, on the one hand, the reasons for the delay, and, on the other hand, the prejudice to the State resulting from the delay, we cannot say that *Page 7 
the trial court abused its discretion in deciding that Balderas's motion to withdraw his plea should be overruled because it was untimely filed.
 {¶ 22} Balderas's First Assignment of Error is overruled.
 III {¶ 23} Balderas's Second Assignment of Error is as follows:
 {¶ 24} "THE DECISION OF THE TRIAL COURT SHOULD ALSO BE REVERSED BECAUSE THE COURT WOULD NOT LET APPELLANT PRESENT EVIDENCE TO PROVE HIS CLAIM."
 {¶ 25} At both the December 26, 2006 and the January 23, 2007 hearing dates, the trial court would not let Balderas's wife, who was present, testify in support of his motion. At the December 26, 2006 hearing date, Balderas told the trial court:
 {¶ 26} "MS. FARLEY [representing Balderas]: Thank you. We have, able to testify on Mr. Balderas' behalf, his wife, Shannon, who can testify as to his citizenship status as of the time of the plea and the consequences of his plea on that citizenship status, specificallly his deportation."
 {¶ 27} To this the trial court responded:
 {¶ 28} "THE COURT: I don't think that's sufficient. Mr. Mayer [representing the State].
 {¶ 29} "I'll give you this. I will give you this. I did not read him O.R.C. 2943.031. I did not do that. I checked the record, and I did not do that, because none of us were doing it in the year 2000. Even though the law went into effect in 1989 — I can give you the exact date that it went into effect, that it was in effect — but no one that I know of, no *Page 8 
judge that I know of, was making that statement on the record until we were told by the Ohio Supreme Court in, I want to say, 2003 or ball park maybe 2002. Since then, I have done it in every single case, but not until the Supreme Court came down on us and said we had to.
 {¶ 30} "So I will take judicial notice of the fact that Mr. Balderas was not read the warning in Revised Code 2943.031. However, in order for the Court to read that, the Court has to know whether or not the Defendant that it's reading it to is a citizen of the United States. And that's what I need today, is proof that he was not. Because if he's not — if he was — I don't know. I guess it all boils down to, where is Mr. Balderas himself?
 {¶ 31} "MS. FARLEY: Your Honor, that information, I do not possess, to be quite honest. I do have, also, some paperwork that his wife presented that is from the US Department of Justice, which I'd be happy to also share with Mr. Mayer and the Court, stating, basically, that he is not a citizen or a national of the United States; the charges-that he is subject to removal from the United States because of his having been convicted of a crime of Domestic Violence, Stalking, Child Abuse, Child Neglect, or Child Endangerment; and the record, basically, from the D.O.J. — from the State's record of deportable/inadmissible alien, relating to Mr. Balderas.
 {¶ 32} "THE COURT: Well, the other thing that concerns me is, if he is not here and if I were to grant that Motion, then that prejudices the State, because they would not have him here to serve him with new paperwork to refile the charges, which I don't know if you can or you can't, but — I don't know.
 {¶ 33} "MR. MAYER: It would be my belief, your Honor, that the plea would just *Page 9 
be vacated. It would have to be reset for trial. Obviously, the State would face some burdens going forward at that point. We'd have a 6-year-plus-old case to proceed with.
 {¶ 34} "My reading it — and I'm certainly not an expert, but Ms. Boyer and I did some research — it appears to me that it isn't fatal that that colloquy or the clause about some of the potential penalties or consequences of a plea if you're not an alien isn't the entire test. It's a two-fold test.
 {¶ 35} "One is, was it not read, and the State would stipulate — the Court already took judicial notice that that wasn't done —
 {¶ 36} "THE COURT: Right.
 {¶ 37} "MR. MAYER: — but, that there's been a manifest miscarriage of justice consistent with the demands of due process. I would say, from my perspective, it appears that this gentleman has done federal prison time on drug charges. For this issue to come up six years later, it doesn't appear to me that they — at least from what I've heard so far — that they can demonstrate that manifest injustice, that miscarriage of justice, inconsistent with due process that the case law seems to indicate.
 {¶ 38} "THE COURT: Do you have the case law? Do you have the cites?
 {¶ 39} "MR. MAYER: Certainly. I have a memo I can copy, if that makes it easier, or if you'd rather me just read it off.
 {¶ 40} "THE COURT: Is there one particular case that you're relying on?
 {¶ 41} "MR. MAYER: Yes. Well, the one that I've been — the two-fold test is State v. Yun, Y-U-N, 10th District 2005, Ohio 1523.
 {¶ 42} "MS. FARLEY: And just for those purposes, your Honor, we'd also be happy to prepare and present supplemental memoranda. Given three days, I can — *Page 10 
 {¶ 43} "THE COURT: I'd like that.
 {¶ 44} "MS. FARLEY: Even sooner than that, I can probably have something in.
 {¶ 45} "THE COURT: I would like that because I don't know if it is absolutely fatal to the situation or not. And I certainly would be happy to read it because I have another case from, I think, 1991 that's going to come up, too, sitting on my desk at the moment. And it pre-dated my being a Judge here. And I know that's going to come up, so I certainly need to know all the in's and out's of what's going on, both sides. My major concern is that he is not here. Has he been deported?
 {¶ 46} "MS. FARLEY: My —
 {¶ 47} "MR. MAYER: It would —
 {¶ 48} "MS. FARLEY: Oh, go ahead, Mike.
 {¶ 49} "MR. MAYER: Sorry, Keri. It would appear from his CCH, that, in fact, is-it appears to me he may have been deported more than once. Quite frankly, your Honor, the CCH's, when we get into the federal system, aren't as easy for me to understand.
 {¶ 50} "MS. FARLEY: They are confusing, I know.
 {¶ 51} "THE COURT: I can't say that I understand them either.
 {¶ 52} "MS. FARLEY: And, again, the witness that we have present for today, your Honor, would be available to go through some of those procedures.
 {¶ 53} "THE COURT: And who is it? Who's here?
 {¶ 54} "MS FARLEY: His wife. She was also the victim or complaining — well, victim, I suppose, in the case that we're trying to vacate the plea on as well. *Page 11 
 {¶ 55} "THE COURT: I'm not going to consider his wife as an expert to testify on issues of citizenship or on issues of deportation and the reasons for deportation.
 {¶ 56} "MS. FARLEY: Oh, no.
 {¶ 57} "THE COURT: I need to get that from paperwork. I need that from court records. I need to see a copy of the deportation order, or orders, and what he was deported for. But, most importantly, I think it's imperative that Mr. Balderas be here to testify on his own behalf. I don't know how I can do it without that. And I'm not exactly sure why we're here today if, indeed, he has a federal record which easily trumps misdemeanor court, as I've been reminded. I don't understand why we're here today.
 {¶ 58} "MS. FARLEY: And that, your Honor, is because the federal case is not the reason for his deportation. And there is also in the papers a letter from the United States Attorney's Office and FBI where they agreed, in the context case, not to support his deportation. Hence, the reason for the deportation was not a federal case, but it was actually this case arising out of this court. And, again, his wife —
 {¶ 59} "THE COURT: And you have paperwork to that effect?
 {¶ 60} "MS. FARLEY: It's simply a letter. If you can give me just a moment to unhinge this.
 {¶ 61} "THE COURT: Is this your only copy?
 {¶ 62} "MS. FARLEY: Yes, ma'am.
 {¶ 63} "THE COURT: Okay, I'll make a copy.
 {¶ 64} "MS. FARLEY: Thank you.
 {¶ 65} "THE COURT: This is a letter, August 24, 2001, from Bruce Erickson, an attorney in Seattle, Washington, reference a federal case — I'm sorry, to Bruce Erickson, *Page 12 
an attorney in Seattle, Washington, from a Ms. McNaughton, Assistant United States Attorney, with a copy going to the FBI, which says, This letter will confirm that the United States Attorney's Office and the Federal Bureau of Investigation agree not to support the Defendant's deportation from the United States based on information presently in the government's possession. The Defendant must understand, however, that the United States Immigration and Naturalization Service is not in any way bound by the agreement set forth in this letter. So, I'll make a copy, but it doesn't say anything.
 {¶ 66} "So, five years ago, they didn't support his deportation, but they weren't bound by what they said? I don't know what this means. I don't. And it still doesn't give me any reason why he was deported.
 {¶ 67} "Is there anything in writing that says that Mr. Balderas is being deported because he was convicted of a Domestic Violence, fourth degree misdemeanor, in Fairborn Municipal Court in August of 2000? That's what I need.
 {¶ 68} "MS. FARLEY: Well, the paper speaks for itself.
 {¶ 69} "THE COURT: So this is dated September, 2003. Was he then deported immediately after?
 {¶ 70} "MS. FARLEY: As far as immediately, that, I cannot answer, although he did, rather than go through the arduous deportation proceeding, realizing what the result would be based on that allegation, went through voluntary deportation."
 {¶ 71} When the hearing resumed on January 23, 2007, Balderas was again not present, and his wife was again present, prepared to testify. The trial court asked Balderas's attorney to first explain why Balderas was not present, to which she responded: *Page 13 
 {¶ 72} "MS. FARLEY: Mr. Balderas went through voluntary deportation proceedings where he left the country, rather than going through all of the deportation proceedings with the I.N.S. The reason that they were going to kick him out of this country was because of this conviction, the Domestic Violence conviction out of this court. As such, he cannot be present here today because he is not allowed to be. As such, he did retain counsel to represent him and represent his interests in front of this Court.
 {¶ 73} "As far as any information that the Court would find helpful or find necessary prosecuting this Motion, his wife was present during allproceedings in the court to testify as to what she observed happeningand was present for everything that happened in the immigrationproceedings. She would have the information as far as why he had to leave, what things did and did not play a factor, things along those lines." (Emphasis added.)
 {¶ 74} Later, the trial court explained why Balderas's wife would not be allowed to testify:
 {¶ 75} "THE COURT: I'm not allowing the wife to testify today. And the reason I'm not is, that Balderas is the one who is requesting this. It's his responsibility to move forward with this. Secondly, since Ms. Balderas was the victim of this offense. I have a problem with credibility, quite frankly, and so she will not be in."
 {¶ 76} Later, the trial court explained why it concluded that Balderas had failed in his burden to prove that his deportation was the proximate result of his guilty plea in this case. The trial court then continued as follows:
 {¶ 77} "And the other thing that bothers me is, that this conviction in this court *Page 14 
was in the year 2000. And the one document which I have, a partial document, was dated September 15, 2003. And the Motion was not filed until 2006. So I'm wondering why would not someone have filed on his behalf a request to have this vacated immediately when they found out that this case was causing him trouble? There is a 3-year gap there, and I don't know what happened in that 3-year gap. Why is 3 years reasonable?
 {¶ 78} "I don't think 3 years is reasonable, but maybe there's something else that we don't know that only Mr. Balderas can explain. Is there anything? Before I turn to Ms. Deeds for response to anything, is there anything else you'd like to place on the record?"
 {¶ 79} Near the conclusion of the hearing, Balderas's attorney made the following statement:
 {¶ 80} "MS. FARLEY: Also, I suppose I would, just to state for the record, that, you know, I believe that were Ms. Balderas allowed to testify at a hearing, she could, just from her own knowledge and experience in going through all of this with Mr. Balderas, answer some of the questions for the Court regarding, you know, what Mr. Sullivan may or may not have advised Mr. Balderas as far as the effects of his plea or whether he advised him at all regarding some of the immigration consequences of his plea. She could answer questions regarding which offenses were named as reasons for any deportation proceedings being commenced and whether Mr. Balderas basically engaged in the equivalent of a plea-bargaining process to avoid having to sit in custody while a deportation case was being fought out versus just leaving, things along those lines that would be relevant to the Court and would answer some of the Court's *Page 15 
questions."
 {¶ 81} The State contends that Balderas has failed to preserve this issue for review because he failed to proffer his wife's testimony in accordance with Evid. R. 103(A)(2). Evid. R. 103(A) provides, in pertinent part, as follows:
 {¶ 82} "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
 {¶ 83} "(1). . . .
 {¶ 84} "(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked"
 {¶ 85} Evid. R. 103(B) includes a provision that the trial court "may direct the making of an offer in question and answer form," but this provision was not invoked by the trial court.
 {¶ 86} Although it is a stretch, it is at least arguable that a sufficient proffer was made concerning Mrs. Balderas's testimony on the issue of whether her husband's deportation was the proximate result of his guilty plea and resulting conviction in this case. What is entirely missing, however, is any proffer concerning what Mrs. Balderas would have testified concerning the subject of the delay in the filing of the motion to withdraw the plea.
 {¶ 87} Because the untimeliness of the motion was an independent ground for its denial, we would have to find that Mrs. Balderas would have given relevant testimony on this subject, helpful to her husband, before we could conclude that Balderas was prejudiced by the exclusion of this testimony, and predicate reversal on the trial court's *Page 16 
exclusion of the testimony. On this record, without any proffer of what Mrs. Balderas's testimony would have been relevant to this subject, we cannot find reversible error.
 {¶ 88} Balderas's Second Assignment of Error is overruled.
 IV {¶ 89} Both of Balderas's assignments of error having been overruled, the order of the trial court overruling his motion to withdraw his plea is Affirmed.
 WOLFF, P.J., and GRADY, J., concur. *Page 1